UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND | § | No. 5:15–CV–200–DAE |
| SURETY COMPANY OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MICHAEL PADRON, MARIA | § | |
| PADRON, JOE ALEX MUNIZ, | § | |
| MICHAEL WIBRACHT, LAURA | § | |
| WIBRACHT, RUEBEN | § | |
| VILLARREAL, JAMES BRIAN | § | |
| TAYLOR, FAMEEDA TAYLOR, | § | |
| STEVEN WIBRACHT, ERIN | § | |
| WIBRACHT, RAYMOND JENKINS, | § | |
| WENDY JENKINS, MAPCO, INC., | § | |
| CDI VENTURES, INC., AMCO | § | |
| STEEL FABRICATION, LLC, | § | |
| BLACKHAWK VENTURES, LLC, | § | |
| d/b/a BLACKHAWK | § | |
| CONSTRUCTORS, PROMASTERS | § | |
| CONSTRUCTION, INC., JAMCO | § | |
| VENTURES, LLC, HOMELAND | § | |
| CONSTRUCTION, INC., MBH | § | |
| VENTURES, LLC, MILCON | § | |
| CONSTRUCTION, LLC, TEAM | § | |
| JAMA, CORE LOGISTICS | § | |
| SERVICES, LLC d/b/a CORE | § | |
| CONSTRUCTORS, WPS GROUP, | § | |
| LLC, d/b/a FEDERAL | § | |
| MANAGEMENT SOLUTIONS, | § | |
| PADRON ENTERPRISES, INC., | § | |
| BLACKHAWK-JAMCO A SDVO, | § | |
| LLC, BLACKHAWK/JAMCO JV2, | § | |
| | § | |
| Defendants. | § | |

1

ORDER: (1) GRANTING IN PART AND DENYING IN PART WITHOUT
PREJUDICE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION;
(2) ORDERING DEFENDANTS TO SUBMIT BOOKS AND RECORDS TO
<u>EXAMINATION WITHIN 30 DAYS</u>

Before the Court is a Motion for Preliminary Injunction filed by

Plaintiff Travelers Casualty and Surety Company of America ("Plaintiff") on

March 17, 2015.  (Dkt. # 1 at 29–30, Dkt. # 8.)  On April 23, 2015, the Court heard

oral argument on the Motion.  Gregory Weinstein, Esq., appeared on behalf of

Plaintiff.  Edgar Garcia, Esq., appeared on behalf of Defendants Michael Padron

and Padron Enterprises, Inc. (the "Padron parties"); Bernie Martinez, Esq.,

appeared on behalf of Defendant Maria Padron; William S. Benesh, Esq., appeared

on behalf of Defendants Michael Wibracht, Laura Wibracht, Steven Wibracht, Erin

Wibracht, and Core Logistics Services d/b/a Core Constructors (the "Core

Logistics parties"); Lewin Plunkett and Scott M. Noel, Esqs., appeared on behalf

of Defendants Rueben Villarreal, Manuela Villarreal, James Brian Taylor,

Frameeda Taylor, Mapco Inc., Blackhawk Ventures LLC d/b/a Blackhawk

Constructors, Promasters Construction Inc., WPS Group LLC d/b/a Federal

Management Solutions, Blackhawk-Jamco A SDVO LLC, and Blackhawk/Jamco

JV2 (the "WPS Group"); Thomas Harmon and Uriel Tuck, Esqs., appeared on

behalf of Defendants CDI Ventures Inc. ("CDI") and Amco Steel Frabrication

LLC ("Amco Steel"); and J. Caleb Rackley, Esq., appeared on behalf of Milcon

Construction LLC ("Milcon").  The following Defendants did not appear: Joe Alex

Muniz, Raymond Jenkins, Wendy Jenkins, Jamco Ventures LLC, Homeland

Construction Inc., MBH Ventures LLC, and Team Jama.  The Court will refer to

all of the defendants collectively as "Defendants" or "Indemnitors."

After careful consideration of the memoranda in support of and in

opposition to the Motion, and in light of the parties' arguments at the hearing, the

Court, for the reasons that follow, **GRANTS IN PART AND DENIES IN PART**

**WITHOUT PREJUDICE** Plaintiff's Motion for Preliminary Injunction.

<u>BACKGROUND</u>

Plaintiff is a surety company, which began to issue construction surety

bonds in 2008 naming Mapco, CDI, Blackhawk, Jamco Ventures, Milcon, Team

Jama, J&M Constructors, Jama Constructors, Jamco Group, and Blackhawk/Jamco

SDVO as the principal obligors (collectively, the "Bond Principals").  (Dkt. # 8,

Ex. 1 ¶ 5.)  The bonds were payment and performance bonds for over 100

construction projects with an estimated cost to complete in excess of $50 million.

(<u>Id.</u>)

In exchange for the bonds, Plaintiff executed an Indemnity Agreement

(the "Agreement") and riders to that Agreement with Defendants.  (<u>Id.</u> ¶ 4.)  The

Agreement completely indemnifies Plaintiff and provides that:

> Indemnitors agree to deposit with [Plaintiff], upon demand, an amount
> as determined by [Plaintiff] sufficient to discharge any Loss or
> anticipated Loss.  Indemnitors further agree to deposit with [Plaintiff],
> upon demand, an amount equal to the value of any assets or Contract

> funds improperly diverted by any Indemnitor.  Sums deposited with
> [Plaintiff] pursuant to this paragraph may be used by [Plaintiff to pay
> such claim or be held by [Plaintiff] as collateral security against any
> Loss or unpaid premium on any Bond. . . . Indemnitors agree that
> [Plainitff] would suffer irreparable damage and would not have an
> adequate remedy at law if Indemntitors fail to comply with the
> provisions of this paragraph.

("Agreement," Dkt. # 1, Ex. 1 ¶ 5.)  Additionally, the Agreement obligates

Defendants, "upon demand," to provide Plaintiff access to their "books, papers,

records, documents, contracts, reports, financial information, accounts and

electronically stored information, for the purpose of examining and copying them."

(Id. ¶ 10.)

Beginning in 2014, Plaintiff began to receive claims exceeding $5.5

million under certain bonds naming Blackhawk and Blackhawk/Jamco SDVO as

the principal obligors (the "Blackhawk Bonds").  (Dkt. # 8, Ex. 1 ¶ 6.)  In an

attempt to understand why it was receiving these claims, Plaintiff sent a letter to

Defendants on November 26, 2014, requesting their presence at a December 4,

2014 meeting to discuss the obligations of the Bond Principals, the financial status

of certain Bond Principals, and the impact that the construction contracts and

finances of the Bond Principals could have on Defendants as the indemnitors.

(Dkt. # 1, Ex. 6 at 3–4; Dkt. # 8, Ex. 1 ¶ 10.)

Defendants Michael Padron, Rueben Villarreal, Bryan Taylor,

Armando Aranda, Steven Wibracht, Joe Muniz, Albert Macias, and John Hobbs

attended the December 4, 2014 meeting at Blackhawk's offices with Plaintiff's representatives.  (Dkt. # 8 ¶ 11.)  During the meeting, Plaintiff's representatives expressed their concerns about the financial condition of the Bond Principals and became suspicious as to whether the Bond Principals were properly applying the contract funds received by the Bond Principals on Plaintiff's bonded projects.  (Id.)

Following the meeting, Plaintiff sent Defendants a second letter, which reiterated that, if Blackhawk's "cash flow issues" were not quickly addressed and Plaintiff was forced to pay claims on the bonds, it would need to exercise its rights against Defendants under the Agreement.  (Dkt. # 1, Ex. 7 at 3.) The letter indicated that the claims against the Blackhawk Bonds had exceeded $6 million, although it understood that certain claims should be reduced or resolved, lowering the open bond claims to approximately $2.4 million.  (Id. at 4.)  Plaintiff asked that Defendants provide a proposal showing that Blackhawk would have working capital sufficient to cover the bond claims by December 31, 2014.  (Id.) Plaintiff also put Defendants on notice that it would be contacting them to discuss procuring books and records from the Bond Principals, pursuant to the books and records provision of the Agreement.  (Id.)

Defendants did not comply with Plaintiff's request for a proposal by December 31, 2014.  (Dkt. # 8, Ex. 1 ¶ 13.)  Instead, Armando Aranda of Milcon

emailed Plaintiff a Powerpoint Presentation questioning whether Blackhawk could fund its obligations.  (Dkt. # 1, Ex. 9 at 5.)

On January 12, 2015, Plaintiff and Blackhawk received a letter from subcontractor Manhattan Construction Company ("Manhattan"), which had previously initiated litigation against Plaintiff and Blackhawk to recover $390,713 in allegedly unpaid equipment and materials on the Battle Command Center at Fort Sam Houston project, which Plaintiff had bonded.  (Dkt. # 8, Ex. 1 ¶ 14.)  The letter alleged that Blackhawk had not paid Manhattan $4,584,599 for work on the West Palm Beach project, which Plaintiff had also bonded.  (Id.)  On January 15, 2015, Bryan Taylor of Blackhawk provided a cash flow analysis reflecting a cash flow deficit of $2.8 million.  (Id. ¶ 13; Dkt. # 1, Ex. 8 at 6.)

Concerned by the financial obligations and financial stability of the Bond Principals, Plaintiff issued a demand letter to Defendants on January 21, 2015, which demanded that Defendants deposit $2 million in collateral security on or before January 31, 2015, pursuant to the Agreement.  (Dkt. # 1, Ex. 8 at 7.)  Plaintiff also demanded that each Defendant provide a contact person who would make its books and records available for examination and copying on or before January 31, 2015.  (Id. at 8.)

In response to the demand letter, Defendants requested a two-week extension to comply with the demands.  (Dkt. # 8, Ex. 1 ¶ 17.)  Plaintiff extended

the deadline to February 19, 2015.  (Id.)  Plaintiff did receive responses from some

of Defendants outlining concerns with the demand, and Plaintiff responded with a

letter explaining each Defendant's obligation under the Agreement on February 13,

2015.  (Dkt. # 1, Ex. 11.)  The letter reiterated the February 19, 2015 deadline for

posting collateral and providing a contact person for access to books and records.

(Id. at 14–15.)

         Plaintiff did not receive a response from Defendants by February 19,

2015.  (Dkt. # 8, Ex. 1 ¶ 18.)  On March 3, 2015, Plaintiff received a letter that

indicated that the government was considering terminating Blackhawk's contract

on the West Palm Beach Army Reserve Center project, which Plaintiff had

bonded.  (Id. ¶ 19.)

         On March 6, 2015, Plaintiff issued a final letter to Defendants

demanding that Defendants post $2 million in collateral security and provide

Plaintiff's investigative teams access to their books and records by March 16,

2015.  (Dkt. # 1, Ex. 12 at 6.)

         On March 17, 2015, Plaintiff filed its complaint against Defendants,

seeking specific performance of Defendants' obligations under the Agreement to

provide collateral security in the amount of $2 million and furnish access to books

and records; contractual indemnity to claims under the Agreement; and an

injunction against any Defendant that has fraudulently transferred property as

defined under the Agreement.  (Dkt. # 1.)  The complaint also contained an

Application for Temporary Restraining Order (id. at 29–30), which Plaintiff

supplemented with a memorandum on March 27, 2015 (Dkt. # 8).  The Application

requests that the Court order Defendants (1) to pay Plaintiff or, alternatively, pay

into the registry of the Court $2 million representing an amount as determined by

Plaintiff sufficient to discharge any loss or anticipated loss; and (2) to provide

Plaintiff immediate access to their books, records, accounts, databases, and other

documents and information that Plaintiff has a right to access under Paragraph 10

of the Indemnity Agreement.  (Dkt. # 1 at 29; Dkt. # 8 at 2–3.)

On March 27, 2015, the Court converted the Application for

Temporary Restraining Order to a Motion for Preliminary Injunction.  (Dkt. # 9.)

Defendants submitted their Responses on various dates between April 7 and April

21, 2015.  (Dkts. ## 18, 19, 21, 22, 26, 36, 37, 39, 40.)

Plaintiff has not yet paid out any claims on the bonds.  However,

Plaintiff represents that at present, there are $9.1 million in claims on the bonds

outstanding.[1]

---

[1] The Core Logistics parties argue that the evidence upon which Plaintiff relies to
make its claims is incorrect and outdated.  (Dkt. # 39.)  Specifically, they contend
that many, if not most, of the bond claims for which Plaintiff is seeking additional
collateral have already been satisfied.  (Id. at 10.)  Additionally, the WPS Group
argues that (1) most of the dollar volume in the Manhattan litigation claims will
result in claims by Blackhawk/Jamco against the government and will not expose
Plaintiff to liability; and (2) Manhattan has actually submitted to Blackhawk

DISCUSSION

I.    Applicable Legal Standard

        To secure a preliminary injunction, a plaintiff must demonstrate "(1) a

substantial likelihood of success on the merits, (2) a substantial threat of

irreparable injury if the injunction is not issued, (3) that the threatened injury if the

injunction is denied outweighs any harm that will result if the injunction is granted,

and (4) that the grant of the injunction will not disserve the public interest."

Janvey v. Alguire, 647 F.3d 585, 595 (5th Cir. 2011) (quoting Bynum v. Landreth,

566 F.3d 442, 445 (5th Cir. 2009)).  Injunctive relief is "an extraordinary and

---

$710,000 in claims, rather than the $4 million that Plaintiff alleges.  (Dkt. # 37 at
2.)
        Separately, relying on an affidavit from Rocky Aranda, Milcon
contends that "[n]umerous accounting errors . . . appear to have understated
Blackhawk's financial health by as much as $3.4 million.  Specifically, it appears
accounting records do not properly account for up to $2.7 million in receivables,
and it appear as much as $700,000 in actual costs and forecasted costs on several
projects may have been double-counted."  (Dkt. # 19 at 2.)
        Plaintiff asks the Court to strike this testimony as inadmissible
speculation under Federal Rule of Evidence 602 (Dkt. # 42).  The Advisory
Committee notes to Rule 602 define personal knowledge to mean that the witness
"must have had an opportunity to observe, and must have actually observed the
fact."  F. R. Evid. 602 advisory committee's note.  A statement is not within a
declarant's personal knowledge if the statement is based on information and belief.
See de la O v. Housing Auth. of El Paso, 417 F.3d 495, 502 (5th Cir. 2005) (citing
Bolen v. Dengel, 340 F.3d 300, 313 (5th Cir. 2003)).
        Because Aranda's statements are made upon information and belief
and are not supported by additional evidence demonstrating how Aranda became
aware of the facts contained therein, the Court agrees that the challenged
statements in paragraphs 6, 7, and 8 of Aranda's affidavit are inadmissible and
strikes those statements from the record.

drastic remedy"; it should only be granted when the movant has clearly carried the burden of persuasion on all four requirements.  <u>Anderson v. Jackson</u>, 556 F.3d 351, 360 (5th Cir. 2009) (internal quotation marks omitted) (quoting <u>Holland Am. Ins. Co. v. Succession of Roy</u>, 777 F.2d 992, 997 (5th Cir. 1985)).

  A. <u>Whether the Standard is More Lenient</u>

   Plaintiff contends that a more lenient standard applies for injunctive relief compelling Indemnitors to provide collateral security to a surety when the obligation has been given in a written agreement of indemnity.  (Dkt. # 8 at 8–12.) In support, Plaintiff cites to a provision in the Agreement in which Defendants contractually agreed to fully exonerate the Surety:

> Indemnitors agree to deposit with [Plaintiff], upon demand, an amount as determined by [Plaintiff] sufficient to discharge any Loss or anticipated Loss.  Indemnitors further agree to deposit with [Plaintiff], upon demand, an amount equal to the value of any assets or Contract funds improperly diverted by any Indemnitor.  Sums deposited with [Plaintiff] pursuant to this paragraph may be used by [Plaintiff to pay such claim or be held by [Plaintiff] as collateral security against any Loss or unpaid premium on any Bond. . . . Indemnitors agree that [Plaintiff] would suffer irreparable damage and would not have an adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph.

(Agreement ¶ 5.)  Plaintiff contends that failure to comply with a contractual provision requiring the posting of collateral in the amount that it deems appropriate warrants injunctive relief.  (Dkt. # 8 at 10–11.)

In support of this lenient standard, Plaintiff cites to <u>Wingsco Energy One v. Vanguard Groups Resources</u>, No. H-86-452, 1989 WL 223756 (S.D. Tex. Nov. 15, 1989), where the court held:

> It is not essential that the claim of the surety for relief should depend on the fact that he will incur irreparable injury; nor must he show any fraudulent disposition of property, or the presence of a wrongful purpose, or special reason for fearing loss; and the insolvency of his surety will not preclude him from maintaining the bill.

<u>Id.</u> at *2.  However, as many of the Defendants highlight, this language comes out of the portion of the order discussing the surety's right to <u>quia timet</u> relief, not whether the surety is entitled to that relief through a preliminary injunction.  <u>See id.</u>  The court's analysis of whether the surety is entitled to <u>quia timet</u> relief through a preliminary injunction uses the traditional, four-part preliminary injunction test discussed above.  <u>Id.</u> at *2–3.  Such analysis is in line with precedent throughout the Fifth Circuit and the country, including cases which Plaintiff cites in its argument for the more lenient standard.  <u>See, e.g.</u>, <u>Great Am. Ins. Co. v. Conart, Inc.</u>, No. 1:05-CV-038 (WLS), 2006 WL 839197, at *3–6 (M.D. Ga. Mar. 29, 2006) (applying the four-part preliminary injunction test where Plaintiff sought specific performance of collateral security pursuant to the surety's indemnity agreement with indemnitors).

Accordingly, the Court finds that there is no "more lenient" standard applicable to the claims at issue.

B.    <u>Heightened Burden</u>

Defendant Milcon contends that Plaintiff must overcome a heightened burden on the likelihood of success on the merits and balancing of hardships to prove its entitlement to a preliminary injunction in this case.  (Dkt. # 19 at 5.) Milcon argues that Plaintiff's request is a disfavored preliminary injunction subject to heighted pleading requirements  because it will alter the status quo, seeks mandatory relief, and, if granted, will entitle the plaintiff all the relief recoverable after a full trial on the merits.  (<u>Id.</u>)

"The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." <u>Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.</u>, 441 F.2d 560, 561 (5th Cir. 1971).   For that reason, a mandatory preliminary injunction, which is an injunction that orders an affirmative act or mandates a specific course of conduct and "goes well beyond simply maintaining the status quo pendent lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." <u>Martinez v. Mathews</u>, 544 F.2d 1233, 1243 (5th Cir. 1976); <u>see also</u> Black's Law Dictionary 904 (10th ed. 2014).

Because Plaintiff seeks affirmative relief in the form of access to books and records and collateral security, it requests a mandatory injunction and is subject to a heightened burden.

II.     Request for Access to Books and Records

First, Plaintiff contends that, to date, it has been unable to assess the full amount of liability it faces on the claims on the bonds because Defendants have not made their books and records available as the Agreement requires. Accordingly, it asks the Court to issue a preliminary injunction ordering Defendants to provide their records including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, for the purpose of examining and copying them. (Dkt. # 8 at 22.)

A.     Likelihood of Success on the Merits

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C., 710 F.3d 579, 582 (5th Cir. 2013). "It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Allied Home Mortg. Corp. v. Donovan, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011). To assess

13

the likelihood of success on the merits, a court looks to "standards provided by the substantive law." Janvey v. Alguire, 647 F.3d 585, 596 (5th Cir. 2011).

Plaintiff contends that Defendants' obligations under the Agreement are clear and unambiguous, and include an obligation to provide books and records at Plaintiff's demand for examination and copying. (Id. at 13–14.)  Plaintiff further argues that numerous federal courts have recognized that books and records provisions of indemnity agreements are subject to enforcement through specific performance. (Id. at 14 (citing Exxon Corp. v. St. Paul Fire & Marine Ins. Co., 129 F.3d 781, 785–86 (5th Cir. 1997) (finding that recovery under an indemnity agreement does not require a finding of actual liability where the claim is based on a written contract of indemnification)).)

Under Texas law, which applies to this diversity action, interpretation of indemnity agreements follows the normal rules of contract construction. Associated Indem. Corp. v. CAT Contracting, Inc., 694 S.W.2d 276, 284 (Tex. 1998).  According to Texas rules of contract construction, "if the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." Kern v. Sitel Corp., 517 F.3d 306, 309 (5th Cir. 2008) (editing marks and internal quotation marks omitted) (quoting Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)).

14

In relevant part, the Agreement provides:

> Indemnitors shall furnish upon demand, and Company shall have the right of free access to, at reasonable times, the records of Indemnitors including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, for the purpose of examining and copying them.

(Agreement ¶ 10.)  No party argues that the provision is ambiguous, nor would such argument be successful.  The books and records provision unambiguously requires Defendants to provide Plaintiff access to books and records upon Plaintiff's demand.

Specific performance is an equitable remedy available to recover for a breach of contract.  To obtain specific performance, the plaintiff must demonstrate that the contract in question was valid and enforceable, that the plaintiff was "ready, willing, and able to timely perform his obligations under the contract," and that there is no adequate remedy at law.  Because specific performance is equitable, it is "not a matter of right, but is a matter resting in the court's judicial discretion."  Horner v. Bourland, 724 F.2d 1142, 1144 (5th Cir. 1984).

Plaintiff argues, and the Court agrees, that there is no adequate remedy at law for breach of the books and records provision of the agreement.  As Plaintiff argued repeatedly at the hearing, it cannot assess the financial stability of Defendants, the viability of the bond claims, or its potential liability on those claims without access to Defendants' books and records.  It is clear that the

15

purpose of the provision is to give Plaintiff means to "protect [itself] from future liability," which is incurable through money damages.  See, e.g., Ohio Cas. Ins. Co. v. Fratarcangelo, 7 F. Supp. 3d 206, 217 (D. Conn. Mar. 25, 2014) (granting summary judgment and awarding specific performance to surety on access to books and records because the purpose of the provision was to protect from future liability, which could not be remedied by after-the-fact money damages). Accordingly, there is no adequate remedy at law to cure Defendants' breach of the Agreement's books and records provision, and Plaintiff is substantially likely to prevail on the merits.[2]  This factor weighs in favor of granting the preliminary injunction to require access to books and records.

---

[2] Some Defendants argue that the Agreement is not valid or enforceable as equitably barred by the unclean hands and laches doctrines.  With regard to the unclean hands doctrine, some Defendants contend that (1) the Agreement was procured through fraud by one or more codefendants acting as Plaintiff's agent; and (2) Plaintiff represented to at least some Defendants that the indemnity obligations would not extend beyond the principals' respective indemnity obligations for bonds issued on behalf of companies that they controlled.  With regard to laches, Milcon argues that the Agreement states that any change in control of an indemnitor is an event of default and there have been at least eleven changes in control, but Plaintiff nevertheless ignored the defaults and continued to issue bonds.

    There is insufficient evidence at this stage of the litigation to determine whether these affirmative defenses will affect Plaintiff's availability to recover.  Regardless, the affirmative defenses have only been raised and apply only to certain Defendants and do not affect the liability of every Defendant who has signed the Agreement.

B.     <u>Irreparable Injury and Balancing of Harms</u>

"Federal courts have long recognized that, when 'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" <u>Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana</u>, 762 F.2d 464, 472 (5th Cir. 1985).  Accordingly, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  <u>Dennis Melancon, Inc. v. City of New Orleans</u>, 703 F.3d 262, 279 (5th Cir. 2012) (editing marks and internal quotation marks omitted).

Plaintiff argues that it will continue to suffer irreparable harm without access to Defendants' books and records because the rights will be rendered meaningless if they must await final judgment.  (Dkt. # 8 at 16.)  Plaintiff further argues that the refusal to allow access to books and records raises significant questions as to whether the Bond Principals have the financial ability to satisfy payment obligations and complete bonded projects.  (<u>Id.</u>)  Defendants do not make any argument as to why permitting access to their books and records will cause irreparable injury.  Accordingly, these factors weigh in favor of granting the preliminary injunction to require access to books and records.

C.    Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).

Plaintiff argues that a preliminary injunction is within the public interest because public policy supports protecting sureties, which make modern construction projects possible, and enforcing explicit terms of agreements entered into by knowledgeable parties.  (Dkt. # 8 at 20–21.)  Defendants make no argument that access to books and records would undermine public policy.

Given the public interest in the solvency of surety companies and the necessity of access of books and records for the surety to determine liability on potential bond claims, this factor weighs in favor of granting the preliminary injunction to require access to books and records.  See, e.g., Travelers Cas. & Sur. Co. of Am. v. Indus. Comm. Structures, Inc., No. 6:12-CV-1294, 2012 WL 4792906, at *4 (M.D. Fla. Oct. 9, 2012) ("Courts have recognized that the public interest favors enforcement of contracts as well as solvency of sureties."); First Nat'l Ins. Co. of Am. v. Sappah Bros. Inc., 771 F. Supp. 2d 569, 576 (E.D.N.C. 2011) (recognizing the public interest in enforcing the terms of a valid contract).

D.    Conclusion

The weight of the factors, even under the heightened burden for mandatory injunctions, favors granting the preliminary injunction to require access to books and records.  Accordingly, the Court **GRANTS** Plaintiff's motion as to access to books and records.  Defendants are hereby **ORDERED** to provide their records, including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, to Plaintiff for the purpose of examining and copying them, within thirty (30) days of the issuance of this order.  Failure to comply with this order will result in the imposition of sanctions.  The Court further **ORDERS** that all such information is to be kept confidential and shall not be disclosed to any third parties other than those necessary to prosecute the case.  Any court filings referencing information obtained from these records shall be filed under seal.

III.    Request for $2 Million Collateral Security

Second, Plaintiff moves the Court to order Plaintiffs to deposit $2 million in collateral security, either directly to Plaintiff, or in the Court's registry, so as to discharge any loss or anticipated loss on the pending bond claims. (Dkt. # 8 at 22.)

A.     <u>Likelihood of Success on the Merits</u>

Plaintiff contends that it is likely to succeed on the merits, since the terms of the Agreement are clearly and unambiguously set forth and those terms require Defendants to deposit collateral security with the surety upon request.  (<u>Id.</u> at 13–15.)  Defendants counter that Plaintiff is unlikely to succeed on the merits for various reasons.  Some Defendants argue that specific performance for a collateral deposit of $2 million is unlikely when the contractor has not defaulted on performance, there is no ripe payment bond claim, and there is no immediate threat of any loss.  (Dkt. # 36 at 5.)

As discussed above, specific performance is available to Plaintiff if it can show that the contract in question was valid and enforceable, that the plaintiff was "ready, willing, and able to timely perform his obligations under the contract," and that there is no adequate remedy at law.

The provision at issue provides:

> Indemnitors agree to deposit with Company, upon demand, an amount as determined by Company sufficient to discharge any Loss or anticipated Loss. . . . Sums deposited with Company pursuant to this paragraph may be used by Company to pay such claim or be held by Company as collateral security against any Loss or unpaid premium on any Bond. . . . Indemnitors agree that Company would suffer an irreparable damage and would not have adequate remedy at law if Indemnitors fail to comply with the provisions of this paragraph.

(Agreement ¶ 5.)

20

The provision is clear and unambiguous that the collateral is owed to Plaintiff at Plaintiff's demand in the amount determined appropriate by Plaintiff so long as there is some anticipated loss.  Contrary to Defendants' implication, there is no requirement that Plaintiff have incurred actual loss before demanding collateral.  Accordingly, whether specific performance enforcing that provision is likely to succeed turns on whether Plaintiff has an adequate remedy at law.[3]

The vast majority of courts agree that a surety has no adequate remedy at law when it seeks specific performance to recover collateral prior to incurring loss.[4]  See, e.g., Travelers Cas. & Sur. Co. of Am. v. W.P. Rowland Constructors Corp., No. CV-12-0390-PHX-FJM, 2013 WL 2285204, at *4 (D. Ariz. May 22, 2013) (finding that there was no adequate remedy at law for defendants' repudiation of their collateral security obligations where the surety knew that it would have claims filed against it, but did not know the amount of those claims);

---

[3] No party argues that Plaintiff was unready, unwilling, or unable to satisfy its obligations under the Agreement.  Although some Defendants argue that the Agreement is not valid or enforceable as equitably barred by the unclean hands and laches doctrines, there is insufficient evidence at this stage of the litigation to determine whether these affirmative defenses will affect Plaintiff's availability to recover.  Regardless, the affirmative defenses have only been raised and apply only to certain Defendants and do not affect the liability of every Defendant who has signed the Agreement.

[4] The breadth of case law on this issue forecloses Defendant Milcon's argument that the dispute is not ripe for adjudication because Plaintiff has not alleged that it has paid any claims on the Blackhawk bonds and is apparently still issuing bonds to Blackhawk.  (See Dkt. # 19 at 3.)

Fid & Deposit Co. of Md. v. C.E. Hall Constr., Inc., No. CV411-102, 2012 WL
1100658, at *3–4 (S.D. Ga. Mar. 30, 2012) ("[O]ther courts have recognized that
where liability of a surety under an indemnification agreement has not yet been
determined, but claims are expected, specific performance for any collateral
security provision is proper."); Safeco Ins. Co. of Am. v. M.E.S., Inc., No. 09-CV-
3312, 2010 WL 3928606, at *5–6 (E.D.N.Y. Oct. 4, 2010) (finding that specific
performance of collateral security provisions was only warranted for claims that
had not yet been paid, since the plaintiff had an adequate remedy at law through
breach of contract damages for claims that had already been paid); Hartford Fire
Ins. Co. v. Universal Import, LLC, No. 3:08-CV-271-LRH-RAM, 2009 WL
4042699, at *4 (D. Nev. Nov. 20, 2009) (holding that specific performance on the
collateral security clause was unwarranted because the surety had already paid out
the claims and damages were an adequate remedy at law); Cont'l Ill. Nat'l Bank &
Trust Co. of Chi., 121 F.R.D. 363, 366 (N.D. Ill. 1988) (finding that specific
performance was the only available remedy because the plaintiff had not yet made
any payments under the bonds and therefore had not suffered any damages for
which it could receive compensation under law).

   This is because the collateral security clause of the Agreement is a
"security position for which [the surety] bargained," so that the surety would be
able to secure collateral prior to loss and thereby avoid that loss—even if only

temporarily.   See Safeco Ins. Co of Am. v. Lake Asphalt Paving & Constr., LLC,

807 F. Supp. 2d 820, 827 (E.D. Mo. 2011) (internal quotation marks omitted).

Accordingly, if a surety has not yet paid out on claims, it has not yet incurred

damage, and specific performance is the only available remedy.

        Here, Plaintiff argues that claims have been filed on the Blackhawk

bonds, but it is unsure of its liability because it has not had the opportunity to fully

investigate the extent of those claims or the financial health of the Bond Principals.

Having incurred no actual damages, Plaintiff has no adequate remedy at law.

Accordingly, Plaintiff is substantially likely to prevail on its claim, and this factor

weighs in favor of granting Plaintiff's request to enforce the collateral security

provision.

        B.    Irreparable Harm

        Plaintiff argues that without compelling Defendants to collateralize

Plaintiff, it will suffer irreparable harm.  (Dkt. # 8 at 15.)  Plaintiff contends that

"there is an inherent absence of a legal remedy—and the equally inherent existence

of an irreparable injury—where an indemnitor refuses to perform its contractual,

common-law, and equitable rights, including those of exoneration and quia timet."

(Id. at 16.)  In short, Plaintiff argues that if it has demonstrated inadequate remedy

at law—which the Court agrees that it has—it has equally demonstrated irreparable

injury.

However, in this Court's view, such a conflation of the specific performance's inadequate remedy at law requirement and the preliminary injunction's irreparable injury requirement is improper.  The Southern District of New York has addressed the issue, and the Court finds its reasoning persuasive:

> No case cited by plaintiff, nor any uncovered by independent research, makes the automatic connection urged by plaintiff between the ordinary remedy of specific performance and the extraordinary remedy of a preliminary injunction.  Indeed, to do so would be to create a per se rule that would eliminate the crucial "irreparable harm" branch of the test for preliminary injunctions, in such cases where specifically enforceable contractual provisions are at issue.  Moreover, to create such a linkage would be to misconceive the differing requirements for a grant of specific performance under New York law, and for the issuance of a preliminary injunction as established by the Second Circuit. . . . [U]nder New York law there exists a broad range of situations in which the remedy at law will be considered to be 'inadequate' in the context of an action for specific performance.
> This liberal standard standards in sharp contrast to the Second Circuit's narrow definition of irreparable harm as an injury "requiring a remedy of more than mere monetary damages." . . .
> Correctly viewed, then, a showing of an inadequate remedy at law is a sine qua non of granting injunctive relief, but it is not synonymous with a showing of irreparable harm, and does not, without such a showing, support the granting of a preliminary injunction.

Fireman's Ins. Co. of Newark, N.J. v. Keating, 753 F. Supp. 1146, 1152 (S.D.N.Y. 1990) (internal citations omitted).

While it is true, as the Court concluded, that Plaintiff does not have an adequate remedy at law for the breach of the Agreement's collateral security provision, the harm is not irreparable: Plaintiff can recover the collateral through

24

final relief of specific performance.  See, e.g., id. (finding no irreparable harm for identical reasons); see also Dennis Melancon, 703 F.3d at 279 (5th Cir. 2012) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); Lake Asphalt & Paving, 807 F. Supp. 2d at 821 (granting partial summary judgment for specific performance on the collateral security provision of the agreement); Kearney Constr. Co, LLC v. Travelers Cas. & Ins. Co. of Am., No. 8:09-CV-1850-T-30TBM, 2010 WL 2803971, at *1 (M.D. Fla. July 15, 2010) (granting final relief of specific performance on collateral security provision of the agreement); Travelers Cas. & Sur. Co. of Am. v. J.O.A. Constr. Co., Inc., No. 07-13189, 2009 WL 928848, at *4 (E.D. Mich. Mar. 31, 2009) (granting summary judgment for specific performance on collateral security provision of the agreement).

Nor is there any other indication that the harm is irreparable.  The law is clear that "[s]peculative injury is not sufficient [to show irreparable harm]; there must be more than an unfounded fear on the part of the applicant.  Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury.  A presently existing actual threat must be shown."  United States v. Emerson, 270 F.3d 203, 262 (5th Cir. 2001) (internal quotation marks omitted) (emphasis in original).  Although Plaintiff claims that the current bond

25

claims are evidence that Defendants will not be able to satisfy a judgment if one is issued,[5] it argues in the same breath that it does not know the financial health of Defendants because it has, to date, been unable to access their books and records. In contrast, many of the Defendants contest Plaintiff's characterization of Blackhawk's financial health.  While there is a close question here as to whether the injury is unduly speculative, given the heightened burden that Plaintiff must face in securing a mandatory injunction, the Court concludes that there is insufficient evidence of irreparable harm.[6]  Because Plaintiff must prove each of

---

[5] Some Defendants argue that requiring them to remove $2 million from their working budgets will cause them hardship, as they will not be able to use those funds to satisfy bills and payments owed as part of the normal course of their business.  While this suggests that Defendants may not want to collateralize the working capital, it does not suggest that Defendants would be unable to satisfy a judgment if the Court ultimately ordered specific performance on the collateral. Cf. Keating, 753 F. Supp. at 1153 ("It is familiar law that where a non-movant's assets may be dissipated before final relief can be granted, or where the non-movant threatens to remove its assets from the court's jurisdiction, such that an award of monetary relief would be meaningless, injunctive relief is proper."). (E.g., Dkt. # 40, Ex. 1 ¶ 2 (offering Padron's homestead worth $750,000 in trust).)

[6] Although Plaintiff does not argue the issue, the Court notes that the Agreement's provision that states, "Indemnitors agree that Company would suffer irreparable damage . . . if Indemnitors fail to comply with the provisions [of the collateral security clause]" is insufficient to establish irreparable harm.  See Dominion v. Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1266 (10th Cir. 2004) (finding that contractual stipulations of irreparable harm are insufficient to support a finding of irreparable harm and an award of injunctive relief); Henson v. Patriot Co., LLC v. Medina, No. 5:14-CV-534-XR, 2014 WL 4546973, at *4 (W.D. Tex. Sept. 11, 2014) ("Though a contractual provision declaring irreparable harm is evidence of irreparable harm, a provision alone is insufficient for a court to definitively conclude irreparable harm.").

the four elements of the preliminary injunction, the failure to demonstrate irreparable harm is fatal to Plaintiff's motion.  Accordingly, the Court **DENIES WITHOUT PREJUDICE** Plaintiff's Motion for Preliminary Injunction as applied to the collateral security provision.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction **IN PART**, in so far as it seeks access to Defendants' books and records (Dkts. ## 1, 8).  Accordingly, Defendants are hereby **ORDERED** to provide their records, including, but not limited to, books, papers, records, documents, contracts, reports, financial information, accounts and electronically stored information, to Plaintiff for the purpose of examining and copying them, within thirty (30) days of the issuance of this order.  Failure to comply with this order will result in the imposition of sanctions.  The Court further **ORDERS** that all such information is to be kept confidential and shall not be disclosed to any third parties other than those necessary to prosecute the case.  Any court filings referencing information obtained from these records shall be filed under seal.

However, the Court **DENIES** Plaintiff's Motion **IN PART WITHOUT PREJUDICE**, to the extent that it seeks $2 million in collateral security from Defendants.  Plaintiff shall have leave to refile should Plaintiff believe that changed circumstances warrant a preliminary injunction .

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, May 1, 2015.

David Alan Ezra
Senior United States Distict Judge